UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID SCOTT,

        Plaintiff,

vs.
        Case No. 12-cv-12469
        HON. GERSHWIN A. DRAIN

AMERITECH PUBLISHING, INC., d/b/a
AT&T Advertising Solutions, AT&T Advertising
& Publishing, AT&T, White Pages, AT&T Yellow
Pages, AT&T Yellow Pages-Michigan, AT&T Directory
Operations, AT&T Yellow Pages-Midwest, a Delaware
corporation; *et al.*,

        Defendants.

_____/

**ORDER GRANTING CWA'S MOTION TO COMPEL ARBITRATION [#28], DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT [#42] AND DISMISSING ACTION WITHOUT PREJUDICE**

**I.  INTRODUCTION**

On June 6, 2012, Plaintiff, David Scott, filed the instant action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. seeking recovery of approximately $175,000.00 in losses to his pension and retirement benefits. Presently before the Court is Defendant, Communication Workers of America's ("CWA") Motion to Compel Arbitration or to Dismiss because Plaintiff Failed to Exhaust Arbitration Remedies, filed on December 5, 2012, and Plaintiff's Motion for Leave to File Second Amended Complaint, filed on January 8, 2013. These matters are fully briefed and a hearing was held on April 2, 2013.

-1-

For the reasons that follow, the Court grants CWA's Motion to Compel Arbitration, denies without prejudice Plaintiff's Motion for Leave to File Second Amended Complaint and dismisses this action without prejudice.

## II. BACKGROUND

Plaintiff began his employment with Defendant, Ameritech Publishing, Inc. ("API"), on March 11, 1991. Plaintiff began in the sales department and eventually was moved to the collections department. As an employee of API, Plaintiff was represented by CWA, as well as by Defendant Local 4108, a CWA affiliate. API's parent, AT&T, sold a majority interest in its Yellow Pages operations to Defendant, YP Midwest Publishing, LLC ("YP") in May of 2012.

Throughout his employment, Plaintiff participated in API's retirement plan. Under the Plan, a person must reach the age of seventy-five (75) in order to receive full retirement benefits. This can be accomplished by various combinations of years of service and the employee's age. As of June 24, 2012, Plaintiff would be fifty-five years of age and would have been employed with API for twenty-one years total, thus he would have reached the "modified rule of 75" rendering him eligible for full benefits upon his retirement.

On April 18, 2012, in anticipation of the pending sale, Marty Szeliga, an Executive of Defendant Local 4108, met with API employees to explain the sale of AT&T Yellow Pages and the formation of YP and to discuss API's Retirement Incentive Offer ("RIO"). The RIO was available to union-represented API employees, including Plaintiff, who were within two years of retirement eligibility. Szeliga explained that there was a "2 plus 2" offer from API and anyone within twenty-four months of retirement (age plus years of service) would qualify. Plaintiff asked Szeliga if he took the RIO whether he would receive his full pension, and Szeliga assured him that he would

receive his full pension if he retired early under the RIO.

On April 19, 2012, Plaintiff received email correspondence which attached the RIO. However, Plaintiff maintains that the information received concerning participation in the RIO was not clear as to the actual benefits a participant would receive. On April 20, 2012, Plaintiff again contacted Szeliga inquiring whether the "2 plus 2" offer would provide him with full pension benefits and Szeliga again assured Plaintiff that he would receive his full benefits if he accepted the RIO, even though he would be retiring about two months before his fifty-fifth (55th) birthday. On April 23, 2012, Plaintiff signed and faxed back the RIO.

When Plaintiff learned different information concerning the RIO, he contacted Szeliga, who repeated what he had said before, but also said he would double check with Angela Miller, the President of Defendant Local 4108, and Monica Hogan, a CWA International Representative. Szeliga later phoned Plaintiff and told him that the RIO permitted Plaintiff to reach the "modified rule of 75," therefore Plaintiff would receive his full pension even though he was leaving the company before his fifty-fifth (55th) birthday.

On April 25, 2012, Plaintiff received the Fidelity estimates he requested the day that API announced its sale to YP. Two estimates were provided; one calculated Plaintiff leaving API on April 16, 2012, and the other estimate calculated Plaintiff leaving the company on his birthday, or on June 24, 2012. There was a very large difference (nearly 50%) in the amount Plaintiff would receive under the two calculations. Plaintiff immediately contacted Hogan and Miller to seek guidance. Neither Miller nor Hogan returned his phone calls. Szeliga eventually called Plaintiff and again reiterated that Plaintiff should not worry and that he would receive his full pension.

Plaintiff was very concerned and decided to send email correspondence rescinding his

acceptance of the RIO.  At this point, the deadline for submitting the RIO was still a few days away and Plaintiff was still employed at API.  Plaintiff did not receive a response to this email.

On April 26, 2012, Plaintiff learned yet more information from the AT&T website concerning the RIO.  Specifically, the information revealed that there would be no amendments to the pension by taking the RIO.  The next day Plaintiff contacted Szeliga to inquire about the information on the AT&T website.  Szeliga stated that it was his understanding that the RIO was a "2 plus 2" program.  He further advised that Hogan had recently sent him an email stating that she was still negotiating the "2 plus 2" program.  Later that day, Szeliga sent a text message to Plaintiff stating, "The Lump Sum is available, The 2/2 does not add to your pension calculation. Should you not reach the modify rule of 75 then there is the penalty associated with the pension."  After placing calls to Szeliga and Miller inquiring what he should do, Plaintiff thereafter received a text back from Szeliga stating: "Just spoke to Ms. Hogan who spoke with Labor. [Plaintiff] needs to send a Note with date and signature to the number he faxed the original paperwork to.  Doc should state he wants to rescind his paperwork.  She states the company will accept."  Plaintiff promptly faxed a second document stating that he was rescinding his participation in the RIO.

On May 1, 2012, Plaintiff sent a text message to Szeliga: "Still no news if they rescinded the paperwork."  Thereafter, Plaintiff sent another text to Szeliga": "Just received my exit interview papers for May 8th please hurry!"  He followed up with the following text message: "Just received a call from Kelly Thompson [Director of Customer Service at API] she just received a call from labor stating that they are not going to rescind my request!"  Plaintiff also sent an email to Hogan personally asking for her assistance in getting the RIO rescinded.

On May 7, 2012, Plaintiff sent a text message to Szeliga stating: "I am running out of time."

Szeliga wrote back: "Nothing from Monica yet, we're told she is working on the matter." Plaintiff's May 8, 2012 exit interview coincided with the completion of the sale to YP. Plaintiff was terminated effective May 8, 2012. On May 9, 2012, Szeliga called Plaintiff and stated that they had to wait until the transaction closed before they could write a grievance on the matter. Plaintiff asked for a copy of the grievance, but was not provided a copy until September 17, 2012.

The May 4, 2012 Union Grievance Report states "retracting the RIO [David Scott] submitted." The grievance was filed under API's and YP's (hereinafter "the Company") Collective Bargaining Agreement's ("CBA") grievance procedure, which states:

> A grievance is a complaint involving the interpretation or application of any of the provisions of [the CBA]. It is agreed between the Company and the Union that the Grievance Procedure will be the means utilized for the settlement of any grievance.

Additionally, the CBA provides that the "dismissal" of "any employee" must be based on "just cause." Ultimately, the Company denied the grievance. CWA then submitted the grievance to arbitration, per the CBA's arbitration clause:

> If at any time the parties are unable to resolve the differences regarding any provision of this Agreement through full and complete use of the grievance procedure . . . the matter shall be arbitrated upon written request of either party of this Agreement to the other.

CWA and the Company then followed the contractual process for choosing an arbitrator. The parties mutually selected labor arbitrator Stanley Dobry. CWA was prepared to argue, among other things, that the Company's refusal to accept Plaintiff's revocation of the RIO constituted constructive discharge without just cause, violating CBA Article 15. The remedy sought was reinstatement so that Plaintiff could earn credit toward a full pension award in accord with the CBA.

On May 23, 2012, Szeliga advised Plaintiff that the grievance had gone to arbitration. On May 25, 2012, Szeliga advised Plaintiff, per Hogan's instructions, to go ahead and send in the Company's Release and Waiver form, as well as to apply for unemployment. Plaintiff claims that the Union advised him not to provide too much information to the unemployment agency, rather Plaintiff was only to advise that the company he worked for had been sold and there was reduction in workforce.

On May 31, 2012, Plaintiff sent a demand letter to CWA/Local 4108 representatives advising of the claims and timing concerns and requesting action by June 4, 2012. The Union's attorneys responded on June 1, 2012, indicating that the attempted rescission was timely and that this was the Company's issue. Since the arbitration process has been initiated, the Company has engaged in obstructionist behavior by refusing to arbitrate and conditioning arbitration on bifurcation and other restrictions inconsistent with the CBA.

Plaintiff filed a First Amended Complaint on September 28, 2012, raising the following claims: ERISA violation against API for failure to pay plan benefits, Count I; ERISA violation against API for breach of fiduciary duties, Count II; ERISA violation against YP for failure to pay plan benefits, Count III; ERISA violation against YP for breach of fiduciary duties, Count IV; fraudulent misrepresentation against CWA, Count V; negligent misrepresentation against CWA, Count VI; fraud in the inducement against CWA, Count VII; fraudulent misrepresentation against CWA, Local 4108, Count VIII; negligent misrepresentation against CWA, Local 408, Count IX; fraud in the inducement against CWA, Local 4108, Count X; silent fraud against API, Count XI; silent fraud against YP, Count XII; tortious interference against CWA, Count XIII; and tortious interference against CWA, Local 4108, Count XIV. Plaintiff alleges that Defendants' actions

-6-

resulted in approximately $175,000 worth of losses to his pension benefits.

## III. LAW & ANALYSIS

### A. CWA's Motion to Compel Arbitration or to Dismiss for Failure to Exhaust Arbitration Remedies

In its motion, CWA requests, among other things, that the Court compel Plaintiff and the Company to complete the arbitration, which will resolve in whole or in part Plaintiff's claims against the Company, CWA and Local 4108, and simplify or eliminate the need for this litigation. The Court agrees that the parties should be compelled to complete the arbitration process prior to this Court's consideration of the issues herein.

The Court proceeds under the presumption that national labor policy favors arbitration. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581 (1960); *see also United Steel Workers of America v. Cooper Tire*, 474 F.3d 271, 277 (6th Cir. 2007). Further, federal law favors arbitration of disputes arising out of collective bargaining agreements and requires exhaustion of arbitration remedies as a prerequisite to litigation. *See United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus., Local No. 577 v. Ross Bros. Const. Co.*, 191 F.3d 714, 717 (6th Cir. 1999).

Therefore, parties to a collective bargaining agreement containing an alternative dispute resolution procedure must first exhaust their remedies through that process prior to filing suit in this Court. *Id.* A party's failure to do so waives the right to pursue that claim in federal court. *Id.* Additionally, a federal district court cannot review the ruling of an arbitrator unless it is a final resolution of the matter. *See Island Creek Coal Sales Co. v. City of Gainesville, Fla.*, 764 F.2d 437, 440 (6th Cir. 1985) (finding that incomplete or ambiguous arbitration awards are properly remanded to the arbitrator for further proceedings); *see also Teamsters Local Union 486 v. Quality Carriers,*

*Inc.*, No. 02-10059-BC, 2003 WL 164254, *5-6 (E.D. Mich. Jan. 22, 2003) (finding that arbitration process was not complete under the parties' CBA, therefore the Court lacked subject matter jurisdiction over the dispute).

Absent "positive assurance" that a particular dispute was intended to be excluded, courts defer to the collectively-bargained arbitration procedures. Any doubts concerning arbitrability are "resolved in favor of coverage" by CBA procedures. *AT&T Technologies, Inc. v. CWA*, 475 U.S. 643, 650 (1986); *see also Warrior & Gulf Navigation Co.*, 363 U.S. at 582-83.

Grievances seeking to revoke an employee's resignation are precisely the types of issues that should be presented to labor arbitrators. *See Moss Supermarket*, 99 LA 408, 412-13 (Arb. Grupp 1992) (company was not inconvenienced or prejudiced by withdrawal attempt); *Minnesota Pollution Control Agency*, 97 LA 389, 392 (Arb. Daly 1991) (state employer did not accept resignation or detrimentally rely on it); *Davis Cabinet Co.*, 45 LA 1030, 1033 (Arb. Tatum 1965) (employee's tender of resignation is an offer that can be withdrawn prior to acceptance). Here, the CBA authorizes the arbitrator to provide Plaintiff the relief he seeks, specifically reinstatement so he can accrue additional pension credit. The arbitrator can resolve whether the Company's refusal to accept Plaintiff's revocation of the RIO caused Plaintiff's involuntary termination. Further, if the arbitration does not address all of Plaintiff's claims, he is free to return to this Court. *See UAW v. TRW Automotive, U.S., LLC*, No. 11-cv-14630, 2012 WL 4620879, *4 (E.D. Mich. Sept. 30, 2012). Thus, there is no justification for continuing this litigation without first exhausting the arbitration proceedings.

Further, Plaintiff does not oppose CWA's Motion to Compel Arbitration, nor does Local 4108 object. The only objection comes from API and YP. The Company argues that there is no

basis upon which to order the parties to continue the arbitration process because Plaintiff's claims seek redress for the violation of the substantive rights contained in the RIO. The RIO does not contain an arbitration clause, predates the CBA, and does not arise under any provision of the CBA.

The Company's assertion that this case centers solely on pension benefit issues governed by ERISA is without merit. This matter is not about whether the pension plan paid Plaintiff his benefits, rather it concerns consideration of whether his benefits were reduced as a result of his unjust and premature separation from employment, and whether the Company had sufficient "cause" to refuse to accept Plaintiff's RIO revocation. Thus, the grievance does not seek review of denied benefits. The Company's reliance on non-controlling, inapposite authorities involving benefit denial claims do not change this Court's conclusion that the parties should be compelled to arbitrate. *See RCA Corp. v. Local 241*, 700 F.2d 921 (3d Cir. 1983) (disputing the interest rate calculation under a pension plan); *Printing Specialities & Paper Products Union Local 680 v. Nabisco Brands, Inc.*, 833 F.2d 102 (7th Cir. 1987) (disputing the interpretation of pension plan eligibility requirement for early retirement). In fact, *RCA* actually supports CWA's argument because the *RCA* court found that the portion of the grievance alleging violation of the CBA was arbitrable, only the pension plan calculation was not. *RCA*, 700 F.2d at 926-27.

Lastly, the Company agreed to arbitrate the grievance at issue herein. However, the Company now maintains that "this fact does not waive" the "right to contest arbitrability." This is nonsensical; the Company agreed to have labor arbitrator Dobry decide Plaintiff's grievance. This establishes that Plaintiff's grievance is governed by the CBA and that the pending arbitration is the proper forum. The Company's arguments concerning the meaning of "just cause," about supposed procedural defects, and the distinction between a "dismissal" and a retracted "resignation," should

be presented to the arbitrator as the Company originally agreed to do.

### B. Plaintiff's Motion for Leave to File Second Amended Complaint

Given that the Court finds that continuing the arbitration procedure is warranted, it is premature to rule upon Plaintiff's Motion for Leave to File Second Amended Complaint. Thus, the Court denies without prejudice Plaintiff's Motion for Leave to File Second Amended Complaint.

### IV. CONCLUSION

Accordingly, based on the above considerations, CWA's Motion to Compel Arbitration [#28] is GRANTED. The parties shall continue with the arbitration proceedings already before labor arbitrator Stanley Dobry. Any party may move to reopen the case once the arbitration has concluded.

Plaintiff's Motion for Leave to File Second Amended Complaint [#42] is DENIED WITHOUT PREJUDICE.

This cause of action is DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

Dated: April 10, 2013 /s/Gershwin A Drain
GERSHWIN A. DRAIN
United States District Judge